## ALEXANDER v. ALEXANDER.

No. 3335.

Circuit Court of Appeals, Tenth Circuit.

Nov. 7, 1946.

Rehearing Denied Dec. 6, 1946.

Writ of Certiorari Denied March 31, 1947.

PHILLIPS, Circuit Judge, dissenting.

————◆————

Cornelius Roach, of Kansas City, Mo. (Daniel L. Brenner and Theodore F. Houx, Jr., both of Kansas City, Mo., Howard Payne, of Olathe, Kan., and Roach & Brenner, of Kansas City, Mo., on the brief), for appellant.

Ralph W. Street, of Kansas City, Mo. (Clayton Brenner, of Olathe, Kan., on the brief), for appellee.

Before PHILLIPS and HUXMAN, Circuit Judges, and BROADDUS, District Judge.

HUXMAN, Circuit Judge.

This was an action on a separation and property settlement contract between Charles Freeman Alexander, the appellant, and Marjorie Longan Alexander, the appellee. Prior to March 14, 1939, appellant and appellee were husband and wife. On March 7, 1939, they entered into a property settlement contract which is the basis of this litigation. The contract contained a number of provisions for the support of appellee and the children of the parties, most of which are not involved in this controversy. Only the second provision of Subsection 6 of the contract is involved in this litigation. It reads as follows:

"Second Party shall, on or before April 15th, in each year, until the death or remarriage of First Party, furnish and deliver to First Party, in Kansas City, Missouri, a true and certified copy of his federal income tax return for the preceding taxable calendar year, and if, as shown thereby or otherwise established, Second Party shall have gross income—from whatever source derived, excluding only capital gains—in any calendar year in excess of $7,500.00, then for every such calendar year Second Party, his estate and legal representatives shall pay to First Party, in Kansas City, Missouri, in Twelve (12) equal consecutive monthly installments, commencing on the first day of May following, a further and additional sum equal to twenty per cent (20%) of the amount by which such calendar year income of Second Party exceeds the sum of $7,500.00, as and for the further

support and maintenance of First Party, until the death or remarriage of First Party."

Appellee obtained her divorce from appellant on March 14, 1939, and on the same day he married his present wife and moved to Texas, where he established his legal domicile and has continued to live there since. The complaint in this case alleged that during the years in question appellant's total income exceeded $7,500, and sought judgment for twenty per cent of such excess under the above provision of the contract. The trial court entered judgment as prayed for and it is from this judgment that this appeal is prosecuted.

It was conceded at the trial that for the years in question the total earnings and income attributable to appellant's efforts and to property which stood in his name exceeded $7,500. To illustrate, in 1943 appellant received by way of salary and otherwise, $14,161.42. It is his contention, however, that under the Constitution and laws of Texas, where he now lives, this income constitutes community property and that therefore one-half thereof is the property of his wife, and that only one-half, or $7,080.71, constitutes income to him.

■ The question posed turns upon an interpretation of the phrase "gross income" as the parties understood and used that term when they executed their contract. Some distinction is attempted to be drawn between the term "gross income" and "gross earnings." While these two terms are not synonymous, neither is there a distinct cleavage in their meaning. Gross income has been defined variously as being the equivalent of gross proceeds, gross receipts, gross profits, gross income, or gross earnings.[1] It is conceded that "gross income" is the broader term. It includes gross earnings, as well as other items not strictly within the definition of gross earnings. So that, by the use of the term "gross income" appellee got an interest not only in appellant's gross earnings, but also in other items of his income in addition thereto.

The term "gross income" does not carry the same definite and inflexible meaning under all circumstances and wherever used. Its meaning depends upon the subject under consideration, the connection in which it was used, and the results intended to be accomplished.[2]

■ Our problem, then, is to ascertain the sense in which the parties used this term in their contract. To do this, it is necessary not only to consider the subject matter of the contract, but also the place of its execution, because the place where a contract is executed "governs its nature, validity, and interpretation, unless it appears that the parties, when entering into the contract, intended to be bound by the law of some other place." Gossard v. Gossard, 10 Cir., 149 F.2d 111, 112. Admittedly, this is a Missouri contract. The parties lived in Missouri, the contract was executed in Missouri, and was to be performed there. It follows that the contract is to be interpreted under the Missouri law.[3]

There is no uncertainty or ambiguity in the subject matter or the result sought to be accomplished by the execution of the contract. The parties were husband and wife, and had children. They were separating, and it is quite apparent from the record that they contemplated a legal dissolution of their marital ties. The husband recognized his continuing liability to make financial contribution to the support of his wife and children. This was the subject of the contract. The contributions were determined and measured by his ability to pay. Definite commitments were made, measured largely by his then existing ability to pay. It is also quite apparent that the parties considered an increased ability to pay, resulting from increased earnings or income, and it was agreed and understood that in that event he should be liable for additional payments measured in terms of the increase. So they provided that in the years in which his gross income exceeded $7,500, he should make an additional contribution of twenty per cent of such increase.

In what sense, then, did they use the term "income" when they provided for this additional contribution? How shall we de-

[1] See 31 C.J., p. 401, Sec. 6; 38 C.J.S., Gross Income, p. 1081.

[2] See First Trust Co. of St. Paul v. Commonwealth Co., 8 Cir., 98 F.2d 27.

[3] See Turner v. New York Life Ins. Co., 8 Cir., 100 F.2d 193; Sauder v. Dittmar, 10 Cir., 118 F.2d 524; Consolidated Flour Mills Co. v. File Bros. Wholesale Co., 10 Cir., 110 F.2d 926.

fine the term to ascertain the sense in which they used it in their contract? They did not have in mind any technical, dictionary definition or distinction between the terms "gross income", "gross earnings", or "gross profits." Nor do we think that the term "gross income" should be technically defined by us in ascertaining the intent of the parties under the contract.[4]

This being a Missouri contract, it must be presumed that when the parties used the term "gross income," they meant and understood "gross income" as that term is understood in Missouri and under Missouri law. There can be no doubt what appellant's income was, for instance, in 1943, under the Missouri law, had he remained in Missouri. Admittedly his income for that year in Missouri was $14,161.42, of which he would then owe to the appellee twenty per cent of the excess of that gross income over $7,500.

Of course, he could go to Texas, but when he went he did not take the contract with him. It remained in Missouri so to speak, a Missouri contract subject to Missouri law, and subject to interpretation under that law. His removal to Texas did not change a Missouri contract into a Texas contract. His obligations under the contract still depended upon the law of Missouri, the place where the contract was made.[5] When he executed this contract in Missouri, he fixed his liability under the canopy of the Missouri law, and he remains thereunder until the performance of the contract is completed.

Affirmed.

PHILLIPS, Circuit Judge (dissenting).

Charles F. Alexander and Marjorie L. Alexander were husband and wife. Irreconcilable domestic differences having developed between them, on March 7, 1939, they entered into a property settlement contract. On March 14, 1939, Marjorie L. Alexander obtained a decree of divorce from Alexander. The decree expressly approved and ratified the contract. At the time the contract was entered into, they had three minor children.

The contract provided that Alexander should pay Marjorie L. Alexander $10,000 in cash; that he should pay her $150 per month for the support and maintenance of the minor children, but that in the event of the death of a child, or upon a child reaching his or her majority, if then self-sustaining, the payments for the support of the children should be reduced one-third; that he would pay her for her support and maintenance $150 per month until her death or remarriage; that simultaneously with the execution of the contract, he would cause the beneficiaries in three outstanding policies of insurance on his life, aggregating $45,000, to be irrevocably changed to Marjorie L. Alexander and the three children, the "survivor or survivors of them"; that he would fully discharge all loans and liens upon such policies and promptly pay the premiums thereon as they became due. Alexander and Marjorie L. Alexander owned, as tenants by the entirety, a residence property in Kansas City, Missouri. The contract provided that Marjorie L. Alexander and the children should have the sole and exclusive right to occupy such residence property as their home, and that Alexander would pay the mortgage debt against such home as it matured, and would pay the taxes on the residence and the cost of exterior repairs and upkeep thereof and of the insurance thereon; and that he would execute a will devising the home to Marjorie L. Alexander in the event she survived him.

By the contract, Alexander transferred to Marjorie L. Alexander all the furniture,

<hr />

[4] In Cocke v. Vacuum Oil Co., 5 Cir., 63 F.2d 406, 407, appears the following statement: "We think that he (the district judge) was right in refusing to decide the cause upon the detached dictionary meaning of the terms used. In the field of contract law, perhaps more than in any other, the 'letter killeth, the spirit giveth life.' It is therefore the office of interpretation to fully illumine words used in contracts that their meaning may be found. It is often almost, if not quite, true that in contracts words mean what their users choose them to mean, neither more nor less, for it is true of most words that their shades of meaning are many, and that they take their color and content from the context and the subject-matter in connection with which they are used."

[5] Naylor v. Baltzell, Fed.Cas.No.10,061; Balfour v. Wilkins, Fed.Cas.No.807.

furnishings, and other personal property in the home.

Paragraph 6 of the contract provided that Alexander, on or before April 15 in each year, until the death or remarriage of Marjorie L. Alexander, should furnish and deliver to her in Kansas City, Missouri, "a true and certified copy of his federal income tax return for the preceding taxable calendar year," and if, as shown thereby or otherwise established, Alexander should "have gross income—from whatever source derived," excluding only capital gains, in any calendar year, in excess of $7,500, then for such calendar year, Alexander would pay to Marjorie L. Alexander, in twelve equal consecutive monthly instalments, commencing on the first day of May following, a further and additional sum equal to 20 per cent of the amount by which such calendar year income of Alexander exceeded the sum of $7,500:

The Alexanders separated in the year 1934. In the fall of 1937, Alexander organized the Texas Water Company, a water public utility, at Fort Worth, Texas, and became president of that company, and established a residence in Fort Worth, Texas, where he has since continuously resided. After the divorce decree was entered, and on March 14, 1939, Alexander married Lou Alexander. Since their marriage, they have maintained their marital domicile at Fort Worth, Texas.

In the year 1939, Alexander received by way of salary and otherwise, $7,148.16, and Lou Alexander received $484.80. In the year 1940, Alexander received by way of salary and otherwise, $7,824.29, and Lou Alexander received $818.28. In the year 1941, Alexander received by way of salary and otherwise, $11,015.92, and Lou Alexander received $783.50. In the year 1942, Alexander received by way of salary and otherwise, $13,634.39, and Lou Alexander received $782.50. In the year 1943, Alexander received by way of salary and otherwise, $14,161.42, and Lou Alexander received $968.80. In the year 1944, Alexander received by way of salary and otherwise, $17,138.02, and Lou Alexander received $1,019.64.

Under the statutes of the State of Texas, a husband and wife, with a marital domicile in that state, form a community or marital partnership; the property acquired by either the husband or wife during marriage, except that which is the separate property of either, is common or community property; and each has an absolute one-half interest in the common or community property immediately upon its acquisition.[1] So far as this record shows, none of the income received is the separate property of either Alexander or Lou Alexander.

The rights of husband and wife in community property in Texas are perfectly equal.[2] In Arnold v. Leonard, 114 Tex. 535, 273 S.W. 799, 804, the court said. "* * * each marital partner owns an estate in the community property equal to that of the other partner; * * *"

In De Blane v. Lynch, 23 Tex. 25, 29, the court said, in part:

"It is true, that in a particular case, satisfactory proof might be made, that the wife contributed nothing to the acquisitions; or, on the other hand, that the acquisitions of property were owing wholly to the wife's industry. But from the very nature of the marriage relation, the law cannot permit inquiries into such matters. The law, therefore, conclusively presumes that whatever is acquired, except by gift, devise or descent, or by the exchange of one kind of property for another kind, is acquired by their mutual industry."

In Burnham v. Hardy Oil Co., 108 Tex. 555, 195 S.W. 1139, 1143, the court said, in part:

"In this State, the beneficial interests of the husband and wife in community prop-

---

[1] Art. 4619, § 1, Vernon's Ann.Texas Stat., Vol. 13; Arnold v. Leonard, 114 Tex. 535, 273 S.W. 799, 804; Wright v. Hays, 10 Tex. 130, 133, 60 Am.Dec. 200; Hammonds v. Commissioner of Internal Revenue, 10 Cir., 106 F.2d 420.

[2] Wright v. Hays, 10 Tex. 130, 133, 60 Am.Dec. 200.

In Mercury Fire Ins. Co. v. Dunaway, Tex.Civ.App., 74 S.W.2d 418, 419, 420, the court said, in part:

"* * * The rights of the husband and wife in community property are unified and equal and their title thereto and interest therein is the same. 23 Tex. Jur. 101, § 80; Lee v. Lee, 112 Tex. 392, 247 S.W. 828, par. 3; Burnham v. Hardy Oil Co., 108 Tex. 555, 195 S.W. 1139."

erty are equal, whether the grant or deed to the property be in the name of only one of them or to them jointly. Though the grant or deed be in the name of the husband, alone, the 'interest' or 'estate' of the wife in the property is as absolute as that of the husband. She acquires her interest in virtue of our law governing community property, and the force which that law imparts to a conveyance of the property to the husband during the marriage. She takes under a grant or deed in his name to the same extent that he does; and it is as fully through the grant as is true of his interest, that she is invested with her right."

The sole issue here presented is the meaning of the phrase "gross income" in paragraph 6 of the contract.

Since the parties made Alexander's annual income tax return the basis for determining his annual gross income, it seems clear to me that they used the phrase "gross income" in the sense it is used in the Federal income tax laws.

Section 22(a) of the Revenue Act of 1938, 26 U.S.C.A. Int.Rev.Acts, page 1008, defines "gross income" as follows:

" 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *."

Under the Federal income tax laws, community income of a husband and wife, with a marital domicile in a community property state, inures one-half to the husband and one-half to the wife, and one-half is includible in the gross income of the husband and one-half is includible in the gross income of the wife, and may be returned accordingly.[3] Under the Federal income tax laws, "gross income" is the income as defined in the statute which inures to the in-

dividual taxpayer in the taxable year. That is the ordinary meaning of the phrase.

But, it is suggested that since the contract was made in Missouri and was to be performed in Missouri, the phrase "gross income" must be construed in accordance with the laws of Missouri. If that be granted, it would not, in my opinion, change the result. Counsel for Marjorie L. Alexander point to no Missouri law, and I have been unable to find any, indicating that the meaning of "gross income" in Missouri differs from the ordinary meaning of the phrase; that is, gain of every character from whatever source derived. Hence, I can only conclude that the meaning of an individual's gross income in Missouri is the gain of every character from whatever source derived inuring to such individual. Surely, it does not include income which, at the moment of its acquisition, belongs absolutely to another.

What counsel for Marjorie L. Alexander really assert, and what the trial court in effect held, is that the phrase "gross income" should be construed to mean the gross income that would have inured to Alexander if his status had been either that of an unmarried person or of a married person with his marital domicile in Missouri. That would introduce hypothetical and undeterminable factors into the situation. We have no way of knowing what Alexander's income might have been had he remained single. It is common knowledge that a good wife may contribute much to the earning capacity of her husband. Likewise, we have no way of knowing what Alexander's earning opportunities would have been had he remained in Missouri.

Moreover, there is no language in the contract, or circumstances surrounding the making thereof, warranting such a construction. Clearly, Alexander had the legal right to remarry and establish his marital domicile in Texas. When the contract was entered into, divorce was obviously imminent and followed seven days thereafter, and there is nothing to indicate that the parties contemplated that Alexander would remain single and, indeed, his remarriage occurred following the divorce on the day

---

3 Hopkins v. Bacon, 282 U.S. 122, 127, 51 S.Ct. 62, 75 L.Ed. 249.

it was granted. Approximately one year and six months before the contract was entered into, Alexander had gone to Texas and there acquired a business and established a residence. At the time the contract was entered into, he was engaged in carrying on such business in Texas and actually resided in Texas. Surely, it was not within the contemplation of the parties, when the contract was entered into, either that Alexander would thereafter remain in Missouri, or that he would not reside in Texas, or some other community property state. Hence, I fail to see any justification for computing "gross income" under paragraph 6 of the contract on the basis of a hypothetical status of Alexander as an unmarried person, or a married person with a marital domicile in Missouri.

Since only one-half of the community gross income inured to Alexander, and the other half, at the very moment of its acquisition, became the absolute property of his wife, Lou Alexander, I am impelled to the conclusion that "gross income" in paragraph 6 of the contract must be measured by one-half of the gross income of Alexander and Lou Alexander in each succeeding calendar year commencing with 1939, so long as their marital domicile remains in Texas, excluding therefrom capital gains, if any.

Counsel for Marjorie L. Alexander contend that the phrase "gross income" should be construed as "gross earnings." In its ordinary sense, "earnings" means compensation received from labor or personal effort. It does not include income such as dividends, interest, rents, and royalties. It seems clear to me that the parties contemplated no such restricted meaning of the phrase "gross income." "Gross income" is a much broader phrase than "gross earnings" and includes gains from whatever source derived. While in the present posture of the parties, construing the phrase as "gross earnings" might inure to the benefit of Marjorie L. Alexander, should Alexander accumulate investments from which he would receive income in the way of dividends, interest, rents, or royalties, the benfit to Marjorie L. Alexander might be substantially less. Indeed, Alexander might reach a financial situation where he would cease his personal efforts and his whole income would be derived from dividends, interest, rents, or royalties.

I would modify the judgment in accordance with the views above expressed.

BROADDUS, District Judge (specially concurring).

The majority opinion states with clarity the holding of the court. I am in full accord with the court's conclusion that the parties intended the property settlement agreement to be construed and understood as a Missouri contract and that the parties did not intend to give extra-territorial effect to the community property laws of the State of Texas.

It should be made clear, however, that at the time the agreement was executed Alexander had been living in Texas for a period of over eighteen months. Notwithstanding that fact, the contract recited that Alexander was a resident of Jackson County, Missouri. That he could be living and working in one place while his legal residence was in another, is academic. The legal residence of a person is a question of intent. It follows that when Alexander, by written contract, fixed his residence in Missouri, it was a binding declaration of the place of his residence, and a further indication that he intended his obligations under the property settlement agreement to be those of a resident of Missouri.