No. 46,628

The Minnesota Avenue, Inc., *Appellee,* v. Automatic Packagers, Inc., and Capital For Business, Inc., *Appellant.*

(507 P. 2d 268)

Opinion filed March 3, 1973.

*John J. Jurcyk, Jr.,* of the firm of McAnany, Van Cleave & Phillips, of Kansas City, argued the cause and was on the brief for the appellant.

*Charles D. Kugler,* of the firm of Carson, Mahoney & Fields, of Kansas City, argued the cause, and *J. W. Mahoney,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

Fontron, J.: This is an action to recover three months' rent. The plaintiff, Minnesota Avenue, Inc., recovered judgment against Capital For Business, Inc., for two months' rent in the amount of

$4900 and against the other defendant, Automatic Packagers, Inc., for $2450, being the rent for only one month.

Minnesota Avenue, Inc. is a real estate management firm having a contract with the city of Kansas City, Kansas, to manage certain real estate known as the Public Levee. Its president and manager is George G. Perry. His duties include the leasing of space and collection of rents. The defendant, Automatic Packagers, Inc., is— or was at the time—engaged in the business of wrapping packages for large national companies. Capital For Business, Inc., which is owned by the Commerce Bank Corporation, is a small investment company chartered by the Small Business Administration primarily for the purpose of making loans to small enterprises. We shall refer to the three corporations as Minnesota, Automatic and CFB, respectively.

For a number of years Automatic had leased fourteen units of space from Minnesota at a monthly rental of $2450. On February 28, 1968, CFB loaned Automatic $50,000 taking as security for the loan all the equipment and fixed assets of the company, its inventory, both present and future, and the accounts receivable. It also took a minor stock interest in Automatic and secured the personal guarantees of the three principal stockholders.

Amortization payments coming due on the loan commencing September 30, 1968, were not paid by Automatic and in December of that year CFB, after learning of some unpaid checks, declared the loan to be in default and placed the accounts receivable on a notification basis, which meant that payments were to be made to it and placed in a special fund. Automatic defaulted on its December rent payment, and on January 2, 1969, after a second month's rent became due and remained unpaid, Perry got in touch with Kirk F. McConachie, vice president of CFB in charge of the Automatic account, and inquired about the company's prospects. Mr. McConachie was "guardedly" optimistic about the future of Automatic; the company was in trouble, he said, but he felt the prospect of an improvement of their position was reasonably good.

During January and February Perry kept in close touch with Automatic's officers, particularly Mr. Davidson, its president, and he called Mr. McConachie a couple of times. In the meantime Mr. Perry reported to and consulted with Kansas City's finance commissioner, Peter J. Matson, as was required under his contract

with the city. Merger possibilities were being explored with three companies during this period and attempts were continued to effect a suitable merger, but ultimately all efforts along this line met with failure.

On March 10, Perry talked with McConachie at the latter's office and was told that although, at the moment, the company's situation was not good, but was bad, yet it had good prospects for the future and was making money; it was in the black for the first time. McConachie also showed Perry a list of existing contracts and accounts receivable. As of April 1, Automatic was able to pay two months' back rent, leaving the February, March and April rent unpaid.

Automatic's financial prospects began to dim after March and ultimately, in early July, CFB exercised its security rights and took possession of all the assets, selling them to American Beauty Macaroni for $27,500, and in addition, liquidated the accounts receivable for between six and seven thousand dollars. Both sums, as well as approximately $10,000 received on the guarantees, were applied on Automatic's indebtedness to CFB which by this time had increased to $58,000 by virtue of additional loans made to Automatic amounting to $8,000. We might add at this point that Mr. Perry had also loaned the company $5,000 during the same time.

Perry continued to follow the fortunes of Automatic to its desolate end, conferring almost daily with its officers, occasionally getting in touch with McConachie, and keeping Mr. Matson informed as to the company's status. But to no avail; Automatic still owed three months' rent when the boom was lowered and this lawsuit was begun. American Beauty Macaroni, we might report, took over Automatic's space in the Public Levee and has occupied it ever since so far as we have been able to learn.

The trial court made certain findings of fact which were to the effect that CFB took over the financial management of Automatic by notifying those who owed accounts to Automatic to pay all their accounts to CFB and by controlling or limiting the disbursement of funds to certain purposes, i. e., payment of taxes, rent, utilities and inventory; that in March McConachie stated in effect the month was one of the best in recent months that Automatic had experienced, and that they "were hopeful that should they continue at this rate, operating in the black for the months of April

and May, that there was some hope and speculation that this company might pull out of the economic difficulties they had found themselves in for some several months prior thereto." The court further found that negotiations and proceedings occurred between Minnesota and Automatic whereby Minnesota did forbear to terminate the rental agreement and permitted Automatic to occupy the premises while CFB and Automatic, working together, endeavored to work out various mergers between two or more third parties.

As a conclusion of law, the trial court found that "an implied contract exists between Capital For Business, Inc., and Minnesota Avenue, Inc., and that Minnesota Avenue, Inc., did perform their portion of the implied contract of forestalling the eviction of Automatic Packagers, Inc., and Capital For Business, Inc., and that defendant Capital For Business, Inc., has failed to comply with said implied contract and is indebted to the plaintiff Minnesota Avenue, Inc., in the sum of two months rental, that being $4,900."

Judgments were entered against CFB for two months' rent and against Automatic for one month's rent. CFB promptly appealed.

As CFB has stated in its brief, it has no quarrel, for the most part, with the trial court's findings of fact; its real complaint lies in the conclusion of law which the court has drawn from the facts, i. e., that an implied contract resulted between Minnesota and CFB.

For its part, Minnesota's real contention, as we find it set forth in its brief, is that McConachie, acting on behalf of CFB, gave glowing reports to Perry as to Automatic's prospects which he later found out were not so, but that he remained silent and failed to inform Mr. Perry of his previous faulty prognostications; that Minnesota relied on McConachie's erroneous information to its disadvantage and did not terminate Automatic's tenancy, thereby losing three months' rent.

As we understand Minnesota's position, it relies for recovery on the principal of quasi contract, not contract implied in fact. We likewise interpret the trial court's conclusion that an implied contract existed between Automatic and Minnesota to mean a contract implied in law, not one implied in fact. The subject of quasi contracts is discussed in 1 Williston on Contracts, 3d Ed., Jaeger, § 3A, pp. 13, 15:

". . . Quasi contractual obligations are imposed by the law for the purpose of bringing about justice without reference to the intention of the parties. . . . As the law may impose any obligations that justice requires, the only limit in the last analysis to the category of quasi contracts is that the

obligation in question more closely resemble those created by contract than those created by tort. . . .

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Quasi contractual obligations are generally based on unjust enrichment or benefit, but this is not universally true. There are many cases where the law enforces in a contractual action a duty to restore the plaintiff to a former status—not merely to surrender the benefit which the defendant has received. . . ."

In *Sharp v. Sharp,* 154 Kan. 175, 117 P. 2d 561, this court spoke of quasi contracts in this way:

"Quasi contracts—contracts implied in law—are not true contracts. They are obligations created by law for reasons of justice. A quasi contract is no more than a legal device to enforce noncontractual duties. Such obligations were enforced at common law by the action of general assumpsit. (Restatement, Contracts, § 5, *Comment a; Hyland v. Dewey,* 146 Kan. 797, 73 P. 2d 1038; 17 C. J. S. Contracts, §§ 3, 4, 6.)" (p. 178.)

Similar dissertations are to be found in 17 C. J. S., Contracts, § 6, pp. 566, *et seq.,* and in 17 Am. Jur. 2d, Contracts, § 3, pp. 334, 337.

Actually the basis of Minnesota's claim of liability against CFB turns out to be fraud and misrepresentation, from which Minnesota would have us imply a resulting quasi contract. Minnesota states this position in its brief: "The real actionable conduct on McConachie's part was his admitted failure to advise Perry in late March, May and April directly of his misrepresentation of the facts concerning Automatic's finances."

In support of this rationale Minnesota quotes from 12 Williston on Contracts, 3d Ed., Jaeger, § 1497, p. 381:

". . . [O]ne who, after making an innocent misrepresentation, discovers the truth yet thereafter silently allows another to act on the misrepresentation is guilty of fraud. The consequence is the same though the original representation was true when made."

The factual premise on which Minnesota relies, *i. e.,* that McConachie misrepresented facts as to Automatic's finances, is subject to considerable question, for the record indicates he was cautious and guarded in his prognosis as to Automatic's future at the very time he and company officers, with Perry's acquiescence, we might say, were attempting to arrange a merger with at least one of several prospects with whom they were negotiating. Moreover, there is little if any substantial evidence that McConachie made any statements to Perry which were factually untrue regarding Automatic's current state of operations or its financial status.

However, entirely apart from the substantial doubts which we believe must be said to shroud Minnesota's claim that McConachie

misrepresented existing facts—as opposed to giving an encouraging picture in March—we are forced to conclude that under sound rules of law Minnesota cannot recover from CFB.

One of the essential elements of actionable fraud is that the party to whom a misrepresentation is made must rely and act on the same to his detriment. In *Todd v. Wichita Federal Savings & Loan Ass'n*, 184 Kan. 492, 337 P. 2d 648, the court outlined the elements needed to establish a cause of action based on fraud, in this fashion:

". . . Where a plaintiff seeks to recover because of the fraud of the defendants, based upon false representations, it is incumbent upon him to allege and prove what representations were made, that they were false, that he believed them to be true, and that he relied and acted upon them to his detriment. (Citing cases.)" (p. 494.)

This definition was quoted with approval in the recent case of *Sipes v. Crum*, 204 Kan. 591, 597, 464 P. 2d 1.

In a somewhat earlier case, *Youle v. Fosha*, 76 Kan. 20, 90 Pac. 1090, it was said:

". . . Fraudulent representations, to be available as a cause of action or defense, must have been relied upon by the complaining party. (Citing cases.)" (p. 25.)

It cannot be said from this record that Perry relied on his March conversation with McConachie. In his diary Perry tersely recorded what occurred at that meeting in these words: "Met McConachie at 11—long discussion. Said bad, but also encouraging. Making money, good prospects."

Perry's testimony at the trial was essentially to the same effect. He testified McConachie had said that "at the moment the situation of the company—Automatic Packagers was not good, but that they had good prospects for the future; they were making money." At another point Perry stated, "McConachie also told him the situation was bad but encouraging as did Mr. Davidson." It would appear that McConachie's statements constituted merely a prognosis—a prophecy, at best. Proof of fraud, we have said, must be clear and convincing. (*Fox v. Wilson*, 211 Kan. 563, 507 P. 2d 252.) The March statements attributed to McConachie fall short of measuring up to that standard.

Perry's notes, placed in his diary long before this lawsuit was filed, reveal he was fully aware of Automatic's uncertain condition at all times. We shall not quote from the entries in his diary except to say that through March, April, May and June, they disclose that Perry knew from conversations held both with McConachie and

with Davidson that Automatic's situation was not encouraging, but was very shaky; that mergers were not being completed; that checks were not being paid; that liquidation was imminent; that the situation was very doubtful and hopes of new capital were slim.

There is no substantial evidence that Perry relied on anything related by McConachie on March 10. Furthermore, it is significant to note that the trial court made no finding that Perry relied on any statements which McConachie may have made. Finding 17 relates that negotiations and conversations did occur between Minnesota and Automatic whereby Minnesota did forbear to terminate the rental agreement. This is a far cry, indeed, from a finding that Minnesota's forebearance was in reliance on anything McConachie may have said.

Furthermore, we cannot say from this record that had Minnesota actually relied on statements made by McConachie in the March conversation that it sustained any injury or disadvantage thereby. On March 10 four months' rent was delinquent—it was then due and unpaid. In the final wrap-up Automatic owed only three months' rent. Its position had improved by $2450 during the four months interval between March 10 and June 30, the date on which this action was filed.

As this court noted in *Todd v. Wichita Federal Savings & Loan Ass'n,* supra, reliance on false representations must result in detriment to the party who acts thereon before there can be a recovery. This principle has long been recognized. In *Trust Co. v. McIntosh,* 68 Kan. 452, 75 Pac. 498, this court held:

"Relief will not be granted on account of false representations not shown to have been relied on as an inducement to conduct resulting in injury." (Syl. ¶ 2.)

We are constrained to hold that the trial court erred in concluding that Capital For Business, Inc., was liable for the payment of rent to Minnesota Avenue, Inc., on the basis of implied or quasi contract. Its conclusion in such respect is not supported either by its findings or by the evidence of record. Accordingly, the judgment entered against Capital For Business, Inc., is reversed with directions to set the same aside and enter judgment in its favor.

It is so ordered.

FATZER, C. J., and KAUL, J., dissent.