No. 48,649

CANTERBURY COURT, INC. and ANDY DOMINGUEZ and WANDA F. DO-
MINGUEZ, *Appellees and Cross-Appellants,* v. STUART ROSEN-
BERG and DAVID RENYER, *Appellants and Cross-Appellees.*

(582 P.2d 261)

Opinion filed July 21, 1978.

*Dan H. Myers,* of Fick, Myers and Horne, of Manhattan, argued the cause and was on the brief for appellants and cross-appellees.

*Charles S. Arthur,* of Arthur, Green, Arthur & Conderman, of Manhattan, argued the cause, and *Charles D. Green, Charles S. Arthur III,* and *John D. Conderman,* of the same firm, were with him on the brief for appellees and cross-appellants.

The opinion of the court was delivered by

MILLER, J.: All parties appeal from the judgment entered by the trial court in this contract action. The facts are complicated. We will state the controlling facts and the judgment entered, and then turn to the issues.

In 1969, Andy Dominguez and his wife, Wanda Dominguez, leased a new building in the Westloop Shopping Center, in the west part of Manhattan, Kansas, from the then owner, Town Building and Investment Co., Inc. (Shortly thereafter, Town Building and Investment Co., Inc. sold the realty to SBL Services Corporation of Topeka.) Mr. and Mrs. Dominguez formed a corporation, Canterbury Court, Inc., the plaintiff in this action. The corporation commenced a new business in the spring of 1970, known as Canterbury Court, upon the leased premises. The business catered to Kansas State University students. It was a

large recreational center occupying some 10,000 square feet of floor space; its facilities included 12 or more pool tables, foosball and other game tables, pinball machines, a restaurant, a band stand, and booths and tables providing seating for several hundred people. Coors beer was sold. Dance bands provided "live music." Both Mr. and Mrs. Dominguez were active in the management and operation of the business.

Stuart Rosenberg came in contact with Canterbury Court through his work as a booking agent for various rock groups. Rosenberg and David Renyer became interested, and on April 18, 1973, entered into an agreement with Canterbury Court, Inc., for purchase of the business.

The agreement provided in substance that the corporation would sell and Rosenberg and Renyer would buy the business known as Canterbury Court, together with all fixtures and personal property used therein, together with the trade name and good will of the business; that the lease would be assigned to Rosenberg and Renyer although the Dominguezes would remain personally liable on the lease; that Rosenberg and Renyer would pay $140,000, payable $15,000 in cash and the balance at $1500 per month, together with 9½% interest on the unpaid principal; that Rosenberg and Renyer would pay the monthly rental to SBL, would maintain the personal property in good condition, keep up certain insurance, pay all taxes, obtain and retain a city beer license, comply with all laws and ordinances, and continue to use Coors beer as the principal beer to be sold on the premises. The contract also provided:

"9. In case of the failure of the said parties of the Second Part to make any of the payments within sixty (60) days of the date when each is due, or to perform any of the covenants on their part hereby made and entered into, this contract shall, at the option of the Party of the First Part, be forfeited and determined, and the Parties of the Second Part shall forfeit all payments made by them on this contract, and such payments shall be retained by the said Party of the First Part in full satisfaction and liquidation of all damages by it sustained; and in case said Second Parties have entered into possession of said premises, and the personal property heretofore enumerated the said First Party shall have the right to re-enter and take possession of the premises and the personal property aforesaid."

Rosenberg and Renyer went into possession on April 18, 1973, and operated the business thereafter. Apparently no difficulties arose during the balance of 1973. In 1974, however, Rosenberg and Renyer became delinquent in their payments and in other

ways failed to carry out their commitments. Mrs. Dominguez wrote to them on May 30, 1974, and expressed the hope that they would catch up on the past due payments.

Mr. Myers wrote to Mr. and Mrs. Dominguez on June 7, 1974, stating in substance that his firm had been retained by Rosenberg and Renyer "for the purpose of obtaining a reformation" of the sales agreement; that his clients had recently obtained documentation that gross income for Canterbury Court for the year 1972 was $90,094.99; that Mr. and Mrs. Dominguez had represented the 1972 gross to be $139,700 during the negotiations for sale; that Rosenberg and Renyer relied on that misrepresentation; that Rosenberg and Renyer "relied on the customary method of determining the value of a business of this nature as being equal to one year's gross income"; that they had been damaged in an amount equal to the difference between the two figures; and demand was made that the contract be reformed to reflect a purchase price of $90,000, and that the payment schedule be revised accordingly.

Plaintiff, Canterbury Court, Inc., commenced this action against the defendants, Rosenberg and Renyer, on June 18, 1974. The petition alleged the contract, alleged six breaches thereof by the defendants, and sought forfeiture and termination of the contract, and damages of $10,187.30 for loss of and damage to the equipment and fixtures. Defendants denied most of the breaches alleged, explained others, claimed fraud, and asked that Mr. and Mrs. Dominguez be made third-party defendants. Claiming fraud in the inception, they counterclaimed for $148,275.02 plus $50,000 punitive damages and attorney's fees. They made a like claim against the third-party defendants. Plaintiff and the third-party defendants denied fraud or misrepresentation.

The contentions of the parties were stated in the pretrial order as follows:

"Plaintiff states that this is a foreclosure proceeding on a contract for the sale of a business, fixtures and equipment of Canterbury Court. Plaintiff alleges that defendants have defaulted on the terms of the agreement in the following:

"(a) They have not paid the payments to plaintiff as contracted for.

"(b) They have permitted the fixtures and inventory to be dissipated.

"(c) They have not used the kind of beer that was stipulated in the contract.

"(d) They have not made the lease payments to the lessor that were assumed under the contract.

"Plaintiff seeks strict foreclosure with no redemption period; that it be given immediate possession; that they have judgment for damages.

"Defendants admit that they have not made the payments under the terms of the contract, but allege that plaintiff is estopped from making its claim because of fraud in the inception of the transaction in the following particulars.

"(a) That plaintiff and its major stockholders, Andy Dominguez, Jr. and Wanda Dominguez, alleged to the defendants that the business had, in 1972, grossed the total of $139,700.00. That it made a net profit from the operation of the business in 1972 of some $45,000.00, when in truth and in fact the gross figure was less than $100,000.00, and the business showed a net loss.

"(b) That defendants relied upon these representations, which the plaintiff knew to be untrue at the time they were made and that defendants would not have completed the transaction had they been aware of the true facts as they now are.

"(c) The measure of damages is in the sum of $140,000.00. Defendants desire to continue in business. Actually defendants' damage is the difference between what they owe the Dominguezes and what the actual value of the property was at the time of sale, which was nothing.

"Defendants contend that they no longer use Coors beer, as a primary beer, because of a change in business circumstances."

Trial to the court commenced on July 2, 1975. Thereafter, the parties submitted proposed findings of fact and conclusions of law, and trial court entered judgment August 29, 1975. Its findings, included within the journal entry of judgment, are in applicable part as follows:

"5. [After April 18, 1973], The defendants . . . went into control of said business and took possession of said personal property.

"6. That notwithstanding the provisions of [the sale] agreement and the commitments therein made by defendants, the defendants failed to comply with the terms of said agreement in the following respects:

"(a) Defendants failed to make the required payments of purchase on time pursuant to the terms of the agreement. The last payment made was June 25, 1974, and is being held in escrow by said escrow agent pursuant to the direction of the defendants. There is due the plaintiff and third party defendants, pursuant to the sales agreement $24,557.60 as of September 1, 1975, which includes interest at 9½% per year.

"(b) Defendants failed to make the required payments to the lessor and its assignee, pursuant to the terms of the sales agreement. There is due the lessor by the defendants payments of $11,731.60 as of September 1, 1975, which includes interest at 8% per year.

"(c) Defendants failed to maintain and keep in good repair, normal wear and tear excepted, the personal property turned over to them, and the loss to the plaintiff is $3,567.50 (Plaintiff's Exhibit D); and to pay Merchant Association dues of $320.00.

"(d) Defendants failed to furnish the plaintiff a quarterly report of gross receipts.

"Thereupon, it is the Judgment of the Court that the plaintiff and third party defendants should be and hereby are awarded judgment against the defendants as follows:

"The agreement between the parties, (Plaintiff's Exhibit 11) is hereby declared terminated and it is Ordered that all payments made by the defendants pursuant to said agreement to said date be forfeited.

"The personal property and fixtures and all replacements purchased by the defendants as substitutes for the property conveyed and described in the addendum to Plaintiff's Exhibit 11 shall be returned to the plaintiff and third party defendants at the close of the business day on August 31, 1975.

"That the plaintiff and third party defendants have judgment against the defendants in the following amounts:

"(a) Past due payments on aforesaid installment agreement in the amount of $24,557.60 as of September 1, 1975.

"(b) Past due rent due lessor in the amount of $11,731.60, as of September 1, 1975.

"(c) Loss suffered by the plaintiff and third party defendants as a result of defendants failure to keep the personal property in good repair in the amount of $3567.50; and Merchant Association dues of $320.00.
a total amount of $40,176.76.

"It is the Judgment of the Court that the past due installment and rent payments are appropriately allowed as damages, inasmuch as during the course of this litigation the defendants continued to occupy and use the premises, and retained the earnings therefrom.

[The court further finds that]

"7. During the early negotiations with the Dominguezes, Rosenberg and Renyer were not furnished with any figures or specific information concerning the financial history of the business, but they were individually and jointly advised by the Dominguezes that it was a good business and if they purchased it they would make lots of money.

"8. That on March 15, 1973, Renyer met individually with the Dominguezes and pressed for financial information concerning the business. The meeting occurred on the premises of Canterbury Court in the business office located therein; Mrs. Dominguez referred to some documents before her and advised Renyer that in 1972 the business had grossed $139,700.00 and had netted approximately $45,000.00. . . .

"9. That upon advice of their attorney, Scott Jarvis, Rosenberg and Renyer on numerous occasions during the negotiations requested the Dominguezes that they be allowed to inspect the corporate financial records. They were always advised that the records were with their accountant in Oklahoma and were unavailable at that time, but they would be made available to them in the future. . . .

"10. In late March, or early April, 1972, Scott Jarvis and Rosenberg made several trips to Manhattan to negotiate with the Dominguezes and they were both given the same information as was given Renyer, that the business had grossed approximately $140,000.00 in 1972 and that there had been a net profit of $45,000.00. . . . Jarvis and Rosenberg, at one of these meetings, indicated their concern as to whether the business was profitable during the summer months when most of the students were gone. In response to this concern, Mrs. Dominguez, in the presence of both Rosenberg and Jarvis, gave them profit and loss statements for May, June and July of 1972, and represented that these were the actual records of the business for that period (Defendant's Exhibits 14, 15, and

16). These profit and loss statements reflected [a profitable operation during the summer months]   .   .   .

"11. That relying upon the representations made to them by the Dominguezes, that the business had grossed approximately $140,000.00 in 1972 and had shown a net profit of $45,000.00 in that same year, and further relying on the oral and written representations that the business was profitable even during the summer months, Rosenberg and Renyer entered into a contract on the 18th day of April, 1973, with Canterbury Court, Inc. through its corporate officers, Andy Dominguez, Jr. and Wanda F. Dominguez, to purchase the said business and obtain an assignment of the lease of the real estate for the sum of $140,000.00, of which $15,000.00 was paid in cash at the execution of the agreement and the balance was to be paid at the rate of $1,500.00 per month together with interest at the rate of nine and one-half percent (9½%) per annum (Defendant's Exhibit 11).

"12. That after April 18, 1973, Rosenberg and Renyer took over the business and commenced operation thereof and have continued to do so until this date. That after several months of operation, Rosenberg and Renyer became suspicious that they had been misled for the reason that they knew they were doing a greater volume of business than the sellers, but they were operating continually at a loss. Rosenberg and Renyer made demands for the promised corporate records but they were never received. Finally in April, 1974, Rosenberg asked the Department of Revenue of the State of Kansas for their verification of the gross sales tax paid for Canterbury Court for the year 1972. Information furnished Rosenberg by the Department of Revenue reflected that gross sales reported to the Department of Revenue for the year 1972 by Canterbury Court, Inc. was in the amount of $90,094.99, as opposed to the $140,000.00 that had been represented to Rosenberg and Renyer at the time of the sale.

"16. That Defendant's Exhibit 6 and Defendant's Exhibits 1 through 5 indicate that in 1972, instead of the business grossing $140,000.00 and netting $45,000.00 as represented by the Dominguezes at the time of sale, the business grossed only $90,101.00 and showed a net profit of only $6,256.00.   .   .   .

"17. That contrary to the testimony of Scott Jarvis and Rosenberg, Wanda Dominguez denied that she prepared Defendant's Exhibits 14, 15, and 16, and that she delivered them to Scott Jarvis and Rosenberg.   .   .   .   The Court   .   .   .   finds that Wanda Dominguez prepared Defendant's Exhibits 14, 15, and 16 and delivered them to Scott Jarvis and Rosenberg while negotiations for the purchase of the business were in progress.

"18. That contrary to the testimony of Scott Jarvis, Renyer and Rosenberg, Andy Dominguez and Wanda Dominguez deny making representations during the negotiations that the business grossed approximately $140,000.00 in 1972 and netted $45,000.00 for that same year.   .   .   .

The Court after carefully considering the testimony of Scott Jarvis, Rosenberg, Renyer, Roger Sink and Terry Ray, notwithstanding the denial of the Dominguezes, finds that Wanda and Andy Dominguez did make oral representations to Rosenberg, Renyer and Jarvis along with Roger Sink and Terry Ray that the business had grossed approximately $140,000.00 in 1972, and had netted $45,000.00 in that same year.

"19.   .   .   .   The Court   .   .   .   finds that Rosenberg and Renyer relied and acted upon the representations made to them that the business was successful and

that it had grossed approximately $140,000.00 in 1972 and had netted $45,000.00 in 1972, and the written and oral representations that the business showed a substantial profit during the months of May, June, and July of 1972.

"20. That Roger Sink testified that he was a public accountant that had been practicing in Manhattan for many years. . . . [H]e was asked his opinion as to the value of the business on April 18, 1973, and rendered an opinion that it was worth perhaps the value of the equipment, which he estimated to be $10,000.00 to $15,000.00. . . .

"24. The Court further finds from a preponderance of the evidence that the fraudulent misrepresentations made by the defendants Dominguez has been shown by clear and convincing evidence . . .

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Additionally, the Court finds the following findings of fact from the evidence:

"1. The actual value of the property at the time of the sale on April 18, 1973 was $90,101.00, which was the amount of the gross income for the year 1972, which was the year that the representations as to gross income were made, as reflected by the books of the corporation and substantiated by the Department of Revenue records."

### The court then entered judgment as follows:

"It is the Judgment of the Court that the defendants have, by a preponderance of the evidence (which evidence, as heretofore indicated, is clear and convincing) proven that the plaintiff acting by and through the third party defendants did knowingly make false statements of the corporate earnings for the year 1972. The gross earnings would be material, in view of the fact that the value of the property was to be determined by the yearly gross. Further, the term 'gross income' is a commonly understood term, unlike terms such as 'net profit,' 'non-operating expense,' 'operating expenses,' etc., which are more subject to varying interpretations.

"It is the further judgment of the Court that the evidence requires the conclusion that the representations as to the several months gross for the summer of 1972 and the expenses incurred, as well as other representations might not alone have properly been relied upon by defendants. However, when considered along with the representations as to the gross of approximately $140,000.00 for 1972 one must conclude that they supported and prompted the reliance by the defendants as to the representations of gross profit. The evidence was such that the Court concludes that the Dominguezes intended to make the representations for the purpose of inducing them to act upon the agreement.

"It is the further judgment of the Court that the election by the defendants to affirm the contract and to have the contract reformed should be and hereby is denied. The Court is of the opinion that before the Court will invoke its equitable powers and reform the contract, the Court would have to be convinced that the defendants would perform the contract as reformed.

"It is observed that the defendants have failed to make certain payments to the plaintiff during the past year. Further, the defendants are in arrears on the payments to the lessor.

"It is the Judgment of the Court that the reformation of the contract whereby the defendants retain possession of the premises under other terms might well

interfere with the rights of the third party lessor. In this case the Dominguezes and others remain obligated to the lessor and the lessor can appropriately look to them for payment. Further, the well known maxim that 'he who seeks equity must do equity,' would have, at the very least, required the defendants to insure that the lease payments were made. This seems particularly true, inasmuch, as they were allowed to remain in possession. The defendants failed to act fairly in this regard.

"It is the judgment of the Court that the measure of damages as indicated in the conclusions of law as proposed by the defendants should be the difference between the actual value of the property and the value it would have had, had the representations been true. Inasmuch as the representations as to the gross income were considered by and used by the defendants in establishing the value, it would appear to the Court that appropriately the true gross value for the pertinent period might well be indicative of the actual value, notwithstanding that the gross might not have been equal to three times the net for the period.

"The Court has heretofore concluded that the representations as to the gross income were relied extensively upon by the defendants, in establishing value. A true gross of $90,101.00 results in a conclusion that the actual value is $90,101.00. The evidence shows the represented value to have been $140,000.00.

"Accordingly, it is the judgment of the Court that the defendants have judgment against the plaintiff and third party defendants in the amount of $49,899.00, which is the difference between the represented value and the actual value as determined by the Court.

"It is the further finding and judgment of the Court that the conduct of the plaintiff, Canterbury Court, Inc., and the third party defendants constituted fraud and was wanton. The defendants are entitled to the recovery of punitive damages in the amount of $2000.00, and should have judgment against Canterbury Court, Inc., and the third party defendants, Andy Dominguez and Wanda Dominguez in such amount.

"It is therefore ORDERED, ADJUDGED AND DECREED, that the plaintiff, Canterbury Court, Inc., and the third party defendants, Andy Dominguez and Wanda Dominguez have judgment against the defendants, Stuart Rosenberg and David Renyer, as follows:

"The agreement between the parties, (Plaintiff's Exhibit 11) is hereby declared terminated and it is Ordered that all payments made by the defendants pursuant to said agreement to date be forfeited.

"The personal property and fixtures and all replacements purchased by the defendants as substitutes for the property conveyed and described in the addendum to Plaintiff's Exhibit 11 shall be returned to the plaintiff and third party defendant at the close of the business day on August 31, 1975.

"That the plaintiff and third party defendants have judgment against the defendants in the following amounts:

"(a)   Past due payments on aforesaid installment agreement in the amount of $24,557.60 as of September 1, 1975.

"(b)   Past due rent due lessor in the amount of $11,731.60 as of September 1, 1975.

"(c)   Loss suffered by the plaintiff and third party defendants as a result of defendants failure to keep the personal property in good repair in the amount of $3567.50; and Merchant Association dues of $320.00; or

the total amount of $40,176.76.

"It is further ORDERED, ADJUDGED AND DECREED, that the defendants, Stuart Rosenberg and David Renyer have judgment against the plaintiff, Canterbury Court, Inc., and the third party defendants, Andy Dominguez and Wanda Dominguez in the amount of $49,899.00 as actual damages, and $2000.00, as punitive damages; and that the judgment of the plaintiff and third party defendants against the defendants be applied as a setoff in the amount of $40,176.76, so that the defendants have actual judgment in the amount of $11,722.24.

"It is further ORDERED, ADJUDGED AND DECREED that the costs be taxed equally to the parties."

The first and principal issue to be determined on appeal is whether the evidence discloses *actionable* fraud. The trial court concluded, upon disputed evidence (and that finding is supported by substantial evidence, and is binding upon us), that plaintiff, through its agents, falsely represented (1) that the 1972 gross income was $140,000, when in fact it was not; (2) that the 1972 net income was $45,000, when in fact it was not; and (3) that the summer months were profitable, when in fact they were not. The court determined that the latter two could not properly have been relied upon by the defendants because "net" is a variable figure, dependent in large measure upon accounting practices and management. This was acknowledged by defendants' witnesses. The figures supplied by plaintiff prior to the execution of the contract, for May, June and July, 1972, reflected gross or total income for those months of $22,686.66; defendants' gross receipts for those months totaled $24,133.69 in 1973 and $29,519.95 in 1974. Expenses, of course, varied.

The annual gross income figure was recognized by the defendants, by defense counsel, and by the trial court as of major significance. "Gross income" is defined in the Internal Revenue Code as "all income from whatever source derived." 26 U.S.C.A. § 61. It is generally understood to mean *total receipts,* every bit of money or credit received, before any expenses or disbursements are made. Although the meaning of the term "gross income" may vary, depending upon the subject under consideration, the context in which it is used, and the results intended to be accomplished (see *Alexander v. Alexander,* 158 F.2d 429, 430 (10th Cir. 1946), cert. den. 330 U.S. 845, 91 L.Ed. 1290, 67 S.Ct. 1086), we conclude that what the parties to this action had in mind, when they spoke of "gross" or "gross income" was the *total receipts* from the business, before *any* payments were made therefrom.

The trial court found the gross income from the business in

1972 was $90,101. It took this figure from plaintiff's report of gross sales to the Kansas Department of Revenue for sales tax purposes in the year 1972. Plaintiff's books, however, reflect gross receipts of $117,742 for that year, and payment of "commissions" to the bands who performed, for a total of $27,641. A deduction of this amount results in what plaintiff shows as "*total taxable income*" of $90,101; that was the figure plaintiff reported to the Department of Revenue. The witnesses explained that sales tax was paid by the plaintiff on the latter figure because the bands were to report and pay sales tax on their respective earnings. Under these circumstances, we conclude that gross income for the year 1972 was $117,742, not $90,101.

The trial court's finding and conclusion is therefore modified to reflect that plaintiff falsely represented its 1972 gross income to be $140,000 when in fact it was but $117,742.

However, the mere proof of the making of a false statement and reliance thereon does not establish *actionable* fraud; it is incumbent upon one who bases a claim upon fraud to prove that the fraud caused injury or loss.

Here, the 1972 gross receipts, represented to be $140,000, were actually only $117,742. But the 1973 gross receipts, when the business was operated until mid April by plaintiff and thereafter by defendants, totaled $149,572; and in 1974, when Canterbury Court was operated solely by the defendants, gross receipts soared to $164,889.33. Whether the defendants operated the business at a profit or not is immaterial; the issue is whether the defendants sustained damages in reliance upon the misrepresentation. They were led to believe that they were purchasing a business which grossed $140,000 in the prior year. During the two years following, the business grossed substantially *more* than that figure.

Though the giving of false information is or may be morally wrong, the false information relied upon must be the cause of injury before a claim for actionable fraud arises. In the early case of *Stinson v. Aultman,* 54 Kan. 537, 38 Pac. 788 (1895), this court said:

"To maintain an action for relief on the ground of fraud, it must be alleged and shown that the fraud occasioned loss or injury to the plaintiff. (Syl. 2.)

"The question then is presented, whether the petition in this case and the facts proven at the trial are sufficient to show that the plaintiffs are entitled to relief on the ground of the fraud of the defendant. To entitle the plaintiffs to such relief, it

must be shown, not only that the defendant was guilty of fraudulent conduct, but that the fraudulent conduct resulted in injury or loss to the plaintiffs. . . ." (pp. 539-540.)

This premise has been followed in many of our later cases. See *Bailey v. Oatis,* 85 Kan. 339, 116 Pac. 830 (1911); *Fleming v. Campbell,* 146 Kan. 294, 69 P.2d 718 (1937); *Todd v. Wichita Federal Savings & Loan Ass'n,* 184 Kan. 492, 337 P.2d 648 (1959); *Sipes v. Crum,* 204 Kan. 591, 464 P.2d 1 (1970); and *Minnesota Avenue, Inc. v. Automatic Packagers, Inc.,* 211 Kan. 461, 507 P.2d 268 (1973).

In the *Minnesota Avenue* case, supra, we said:

"One of the essential elements of actionable fraud is that the party to whom a misrepresentation is made must rely and act on the same to his detriment. In *Todd v. Wichita Federal Savings & Loan Ass'n,* 184 Kan. 492, 337 P.2d 648, the court outlined the elements needed to establish a cause of action based on fraud, in this fashion:

" '. . . Where a plaintiff seeks to recover because of the fraud of the defendants, based upon false representations, it is incumbent upon him to allege and prove what representations were made, that they were false, that he believed them to be true, and that he relied and acted upon them to his detriment. (Citing cases.)' (p. 494.)" (p. 466.)

In Prosser, Torts, 4th Ed. § 110, p. 732, the rule is stated:

". . . [T]he damage upon which a deceit action rests must have been 'proximately caused' by the misrepresentation. . . ."

The Restatement puts the rule in these words:

"One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit *for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."* (Emphasis supplied.) Restatement, Second, Torts § 525, p. 55.

See, also, 37 C.J.S., Fraud § 40, pp. 288-289, and 37 Am. Jur. 2d, Fraud and Deceit § 283, pp. 377-379.

Applying the rule to the facts at hand, we conclude that the evidence in the case before us fails to demonstrate actionable fraud. The defendants actually received a business which grossed more each year than had been represented. That they failed to operate the business profitably was not due to any false statement or misrepresentation by the plaintiff. We hold that there was no actionable fraud, and therefore the judgment in favor of the defendants for actual and punitive damages cannot stand.

The defendants contend that the trial court erred in declaring

the contract terminated, in ordering all payments made by defendants forfeited, and in denying the election of defendants to "affirm" the contract. There is really no dispute in the record as to defendants' breach of the contract. They failed to make contract payments and interest for over a year, and they failed to pay rent to SBL for a like period—although they were in possession of the business and were operating it throughout that period. There were other breaches as well. Under the circumstances the trial court did not abuse its discretion in terminating the contract and ordering the payments, made during the early months of defendants' possession, forfeited. From what we have said earlier in this opinion, the trial court did not err in failing to reform the contract to reflect a smaller purchase price. Finally, in view of defendants' extended failure to pay rent or otherwise abide by the terms of the contract, the court did not err in ordering them to turn over possession to plaintiff. Other points raised by defendants have been considered, but are now moot in view of our determination of the fraud issue.

Likewise, the points raised in the cross-appeal have either been determined above, or are now moot.

One further matter deserves attention. The trial court ordered that defendants forfeit payments already made to plaintiff, approximately $22,000; and it entered judgment against defendants for the amount of additional contract payments accrued up to time of judgment, in the sum of $24,557.60, plus accrued and unpaid lease payments of $11,731.60, plus $3,567.50 for damage to personal property, and $320 Merchants Association dues. Under the terms of paragraph 9 of the sale agreement, quoted above, plaintiff is entitled to retain payments previously made in full satisfaction and liquidation of all damages sustained at the time a forfeiture was declared. Under the peculiar facts of this case, we hold that the defendants should in all fairness and equity be required to pay the rent accruing while they remained in possession of the premises, as well as the damage to the furniture and fixtures and the accrued assessment to the West Loop Merchants Association, required under the terms of the lease. But under the terms of the sale agreement, defendants should not be required both to forfeit the business and the payments previously made thereon, and be required additionally to pay subsequently accrued contract payments of $24,557.60.

The judgment of the trial court is affirmed insofar as it declared the contract terminated, prior payments made by defendants forfeited, restored plaintiff to possession of the business, including personalty and fixtures, and in the entry of judgment against the defendants for past due rent, damage to personal property, and association dues in the total sum of $15,619.10.

The judgment against the defendants for past due installment payments of $24,557.60, and the judgments against plaintiff and the third-party defendants, are reversed. The case is remanded to the trial court with directions to enter judgment in conformity with this opinion.